IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DERICK NICHOLSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| P/O BRUNO ESTEVES, et al. | : | NO. 08-3776 |

MEMORANDUM INCLUDING FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Bartle C.J.                                          March 12, 2010

        Plaintiff, Derick Nicholson ("Nicholson"), brings this

action under 42 U.S.C. § 1983 ("§ 1983") in which he alleges

claims of excessive force, unlawful arrest, and unlawful

imprisonment against defendant, Philadelphia Police Officer Bruno

Esteves ("Officer Esteves").[1]  Nicholson also asserts in his

complaint state tort claims for false arrest, false imprisonment,

and malicious prosecution.[2]

        The court tried this action without a jury and now

makes the following findings of fact and conclusions of law.

---

[1]  The complaint originally included two additional defendants,
Police Officers Robert Slobodian and Charles Nelson.  However, on
February 24, 2010, the complaint was dismissed as to Officer
Slobodian by stipulation of the parties, and the court thereafter
granted Officer Nelson's unopposed motion for judgment as a
matter of law under Rule 50 of the Federal Rules of Civil
Procedure.

[2]  This court has original jurisdiction over Nicholson's § 1983
claims pursuant to 28 U.S.C. §§ 1331 and 1343.  We exercise
supplemental jurisdiction over his state tort claims under 28
U.S.C. § 1367.

I.

Derick Nicholson is a right-handed 56 year-old resident of Philadelphia, Pennsylvania who, on the afternoon of August 17, 2006, arranged to drive an ex-girlfriend, Paula Grant ("Grant"), to a check cashing agency near the intersection of Broad Street and Erie Avenue in Philadelphia.  Nicholson drove Grant in a white Lincoln Town Car (the "Lincoln") and parked on Germantown Avenue, a short distance from the check cashing agency.

Sometime after leaving the vehicle, Nicholson and Grant became engaged in an argument.  Nicholson returned to the Lincoln and locked the doors, thereby preventing Grant from entering the vehicle.  Enraged, Grant drew a Titan Tiger .38 caliber revolver from her purse and threatened to shoot both Nicholson and the car if he attempted to leave her on Germantown Avenue.  When Nicholson opened the driver's side window to speak to Grant, she reached in, unlocked the doors, ran around to the passenger side, and climbed inside.  Once in the vehicle, Grant placed the revolver on the center console area between the front seats.

Someone called police to report that Grant was seen standing by the Lincoln and brandishing a handgun.  At approximately 3:00 p.m., Officer Esteves received a radio broadcast regarding a black female with a gun by a white Lincoln at 3700 Germantown Avenue.  When Officer Esteves arrived at the scene, Officer Charles Nelson was already in the process of arresting Grant on the passenger side of the Lincoln.  Officer Esteves, proceeding to the driver's side of the Lincoln, asked

-2-

Nicholson to step out of the vehicle.  Nicholson did not
immediately comply.  Officer Esteves saw what he perceived to be
Nicholson beginning to make movements towards the car's center
console.  At the same time, Officer Esteves's partner, Officer
Slobodian, saw the revolver in the center console area and yelled
"Gun, gun, gun!" Officer Esteves immediately grabbed Nicholson
and pulled him from the car.

Officer Esteves then placed Nicholson against the trunk
of the Lincoln and cuffed his hands behind his back.  He placed
Nicholson into the back of his police cruiser and drove to the
39th District Philadelphia Police station at 22nd Street and
Hunting Park Avenue.  Nicholson and Officer Esteves were the only
occupants.  At least once during the time between his arrest and
arrival at the 39th District, Nicholson complained to Officer
Esteves that his handcuffs were too tight and were causing pain
and numbness in his right hand and wrist.  Officer Esteves
disregarded Nicholson's complaints.

Because there were no cells available for Nicholson at
the 39th District, he and Officer Esteves remained in the squad
car while they waited for a transport wagon to take Nicholson to
the 35th District at Broad and Champlost Streets.  Again
Nicholson complained about the tightness of the handcuffs, but
Officer Esteves did nothing to loosen them.  From the time of his
arrest at approximately 3:00 p.m. until the arrival of the
transport wagon at approximately 5:30 p.m., Nicholson's hands
remained tightly cuffed behind his back.  During this time he was

-3-

continuing to experience pain, swelling, and numbness in at least his right hand and wrist.

When the transport vehicle arrived, Nicholson was taken inside the 39th District so that his handcuffs could be changed in preparation for transportation to the 35th District. Nicholson testified that he could not tell if his second pair of handcuffs were too tight because his wrists at that point were numb from the cuffs applied by Officer Esteves.  At approximately 6:00 p.m., Nicholson was taken by transport wagon to the 35th District, where he was placed in a cell and the handcuffs were removed.

Nicholson was charged with violating the Pennsylvania Uniform Firearms Act.  18 Pa. Cons. Stat. Ann. §§ 6106, 6108.  On December 11, 2006, the Municipal Court of Philadelphia held a preliminary hearing in which the court found sufficient evidence to support probable cause and scheduled an arraignment for January 2, 2007.  The case was ultimately dismissed.

A week after his arrest, Nicholson went to his primary care physician, Dr. Horace Barsh, for treatment of pain and numbness in his right hand and wrist.  He was diagnosed with a sprain and given Naprosyn for the pain and inflammation.  This treatment did not provide relief.  On September 19, 2006, a month after his arrest, Nicholson's pain became so severe that he checked himself into the emergency room at Germantown Hospital, where he was provided with a splint.

-4-

On October 3, 2006, Nicholson began a series of consultations with an orthopedic specialist, Dr. Sue Lee, at Albert Einstein Hospital.  She noted that "he [had] some complaints out-of-proportion to his clinical findings" and ordered an EMG nerve conduction study and a bone-scan.  On December 4, 2006, Dr. Lee diagnosed Nicholson with right carpel tunnel syndrome, which she treated with an injection.  On January 15, 2007, Dr. Lee gave him another injection and recommended that he undergo decompression surgery for his carpel tunnel syndrome.  On April 16, 2007, Dr. Lee gave Nicholson an additional injection and again urged that he have decompression surgery.  She warned him that if he did not take this step soon he would likely experience irreversible nerve damage.

About nine months later, in January of 2008, Nicholson met with Dr. David Steinberg, an orthopedic surgeon specializing in hand surgery.  During this initial consultation, Dr. Steinberg explained to Nicholson that he could not relate most of Nicholson's symptoms to the handcuffing incident in 2006.  Dr. Steinberg ordered an MRI and advised an operation.  Nicholson returned to Dr. Steinberg in February of 2008, at which time Dr. Steinberg reviewed with Nicholson the results of the MRI.  He restated his recommendation for surgery and cautioned Nicholson that his continued delay could result in progression of the carpel tunnel syndrome and permanent nerve dysfunction.

Dr. Steinberg diagnosed Nicholson as having three separate conditions:  (1) right carpal tunnel syndrome, (2) thumb

carpometacarpal arthrosis ("CMC arthrosis"), and (3) right
trigger thumb.  In May of 2008, Nicholson again met with Dr.
Steinberg.  At this time, Nicholson agreed to schedule surgical
decompression.  During that consultation, Dr. Steinberg told
Nicholson that he should have elected to receive surgery two
years earlier, and that, given the longevity and severity of his
carpel tunnel syndrome, some of his symptoms may be permanent.

On October 22, 2008, Dr. Steinberg performed surgery to
treat Nicholson's right carpel tunnel syndrome and right trigger
thumb.  Thereafter, Nicholson was prescribed Percocet and
attended physical therapy twice per week.  He continued to meet
with Dr. Steinberg for post-operative evaluations.

On December 18, 2008, Dr. Steinberg concluded that
Nicholson's surgical scars were "well healed with minimal
swelling," that he had "good passive motion of the thumb and can
actively move it when encouraged," and that he had no "crepitus,
triggering or locking of the digit."  Dr. Steinberg also
consulted with Nicholson's physical therapist.  Significantly,
they both determined that "his subjective complaints [were] out
of proportion to the objective findings."  Nicholson continued to
insist that his symptoms were caused by the handcuffing incident
in 2006.

Nicholson's final visit with Dr. Steinberg was on
April 19, 2009, at which time Dr. Steinberg determined that
Nicholson's condition was "relatively stable."  Nicholson

-6-

continues to experience pain in his right hand and wrist.  He wears a splint and takes pain medications on a regular basis.

II.

We consider first Nicholson's claims under 42 U.S.C. § 1983, which provides a remedy for plaintiffs who suffer a violation of their rights as established under the Constitution or federal law.[3]  Estate of Smith v. Marasco, 318 F.3d 497, 505 (3d Cir. 2003).  To succeed in any § 1983 claim, a plaintiff must prove that:  (1) the defendant violated a right granted to the plaintiff under the Constitution or federal law, and (2) the defendant was acting "under color of" state law.  42 U.S.C. § 1983; Gomez v. Toledo, 446 U.S. 635, 640 (1980).  Nicholson alleges that Officer Esteves, while acting under color of state law, used excessive force and subjected him to an unlawful arrest

_____

3.  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

and unlawful imprisonment in violation of his Fourth Amendment rights.[4]

We first consider Nicholson's excessive force claim. Allegations that an officer used excessive force are analyzed under the Fourth Amendment reasonableness standard. Graham v. Connor, 490 U.S. 386, 394-95 (1989). "[T]he question is whether the [officer's] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Id. at 397. Under this totality of the circumstances approach, we consider a number of factors, including:  the severity of the crime at issue; whether the suspect poses an immediate threat to officer's safety or to the safety of others; whether the suspect is actively resisting or attempting to evade arrest; the possibility that the suspect is violent or dangerous; the duration of the police action; whether the police action occurs during an arrest; the possibility that the suspect is armed; and the number of persons with whom the officers must contend. Kopec v. Tate, 361 F.3d 772, 776-77 (3d Cir. 2004).  In considering these factors, we keep in mind that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

---

4.  Although Officer Esteves raised qualified immunity as an affirmative defense in his answer, the issue was never raised by him in a pretrial motion or at trial.  Accordingly, we proceed to the merits of Nicholson's claims.

necessary in a particular situation." Graham, 490 U.S. at 396-97.

In 2004, our Court of Appeals held in Kopec v. Tate that an officer's placement of excessively tight handcuffs on an arrestee may constitute excessive force in violation of the Fourth Amendment.  In that case, the plaintiff-arrestee alleged that the defendant-officer applied handcuffs in an excessively tight manner, disregarded the arrestee's repeated requests for them to be loosened, and thereby caused permanent nerve damage to the arrestee's right wrist.  Kopec, 361 F.3d 777.  Reversing the district court's grant of summary judgment in favor of the officer, the Court of Appeals held that the facts alleged by the plaintiff, if credited, "would establish that [the officer's] use of force was excessive in violation of the Fourth Amendment." Id.  However, the court cautioned against reading its holding too broadly.  It stated that its decision may have been different had the officer "been engaged in apprehending other persons or other imperative matters" when the arrestee requested to have his handcuffs loosened.  Id.

The facts here are virtually identical to those alleged by the plaintiff in Kopec.  Officer Esteves applied handcuffs to Nicholson's wrists with excessive tightness and disregarded Nicholson's complaints that the restraints were causing pain and numbness in his right hand and wrist.  At the time Nicholson was complaining about the excessive tightness of his handcuffs, he was submissive and in no way recalcitrant.  The efforts and

-9-

attention of Officer Esteves were directed only toward Nicholson once he was out of the Lincoln.  At that time, Officer Esteves, like the officer in Kopec, "faced rather benign circumstances that hardly justified his failure to respond more promptly to [Nicholson's] entreaties, at least to the extent to ascertain if the handcuffs were too tight."  Id.  By refusing to loosen Nicholson's handcuffs, Officer Esteves's conduct was objectively unreasonable and violated Nicholson's constitutional rights.

As to the second element of Nicholson's claim, Officer Esteves was acting in his official capacity as a Philadelphia police officer when he arrested Nicholson and was therefore clearly acting under color of state law.  See Screws v. United States, 325 U.S. 91, 110-11 (1945) (citing United States v. Classic, 313 U.S. 299, 326 (1941)); Mark v. Borough of Hatboro, 51 F.3d 1137, 1150-51 (3d Cir. 1995).

Nicholson has proven by a preponderance of the evidence that Officer Esteves used excessive force in violation of the Fourth Amendment and did so while acting under color of state law.  Consequently, we find in favor of Nicholson and against Officer Esteves with regard to Nicholson's § 1983 excessive force claim.

We next consider Nicholson's § 1983 claims for unlawful arrest and unlawful imprisonment.  To establish a Fourth Amendment violation, a plaintiff must establish, among other things, that the arresting officer acted without probable cause, that is, without "'proof of facts and circumstances that would

-10-

convince a reasonable, honest' officer that the person arrested has committed a crime." Dull v. West Manchester Twp. Police Dep't, 604 F. Supp. 2d 739, 750-51 (M.D. Pa. 2009) (quoting Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993)); see also Berg v. County of Allegheny, 219 F.3d 261, 269 (3d Cir. 2000). The arrestee's actual guilt is irrelevant, as we are concerned only with whether, at the time of the arrest, the arresting officer had probable cause to believe the arrestee had committed a crime. Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).

At the time of Nicholson's arrest, Officer Esteves was responding to a radio broadcast about an armed and potentially dangerous suspect. When he arrived on the scene, Office Esteves found Nicholson sitting in a vehicle on Germantown Avenue and observed a handgun in the vehicle near Nicholson. Faced with these circumstances, Officer Esteves had probable cause to believe that Nicholson was guilty of the crimes for which he was arrested.[5] We therefore find that no constitutional violation occurred, and Nicholson cannot succeed in his § 1983 claims for unlawful arrest and imprisonment.

---

5. Nicholson was arrested for (1) carrying a firearm in a vehicle or about his person without a license in violation of 18 Pa. Cons. Stat. Ann. § 6106; and (2) carrying a firearm on a public street without a license in violation of 18 Pa. Cons. Stat. Ann. § 6108.

III.

Nicholson also alleges state tort claims against Officer Esteves for false arrest, false imprisonment, and malicious prosecution.[6]

All three state tort claims pleaded by Nicholson require him to prove by a preponderance of the evidence that Officer Esteves acted without probable cause.[7]  As discussed above, Nicholson has failed to meet this burden.  Indeed, putting aside the question of guilt, the evidence was overwhelming that Officer Esteves had probable cause to arrest, seize, and initiate

_____

6.  Although Officer Esteves, in his answer, raised state-law immunity as an affirmative defense to Nicholson's state tort claims, he never raised it in a pretrial motion or at trial.  See 42 Pa. Cons. Stat. Ann. § 8545.  In any event, Officer Esteves could not receive the benefit of such immunity in this case because the statute does not protect against liability for intentional torts.  Id. § 8550; Heckensweiler v. McLaughlin, 517 F. Supp. 2d 707, 719-20 (E.D. Pa. 2007).

7.  A False arrest is an arrest made without probable cause. Renk v. City of Pittsburgh, 537 Pa. 68, 80 n.2 (1994) (citing Pennsylvania Suggested Standard Civil Jury Instructions § 13.04).

A police officer is liable for false imprisonment when, acting without probable cause:  (1) he intends to confine the plaintiff, (2) he actually causes the plaintiff to be so confined, and (3) the plaintiff is either conscious of his confinement or suffers harm because of it.  Pennoyer v. Marriott Hotel Servs., Inc., 324 F. Supp. 2d 614, 619-20 (E.D. Pa. 2004) (citing Gagliardi v. Lynn, 446 Pa. 144, 148 n.2 (1971)).

Finally, in an action for malicious prosecution, a plaintiff must establish that "the defendant initiated the underlying criminal proceeding without probable cause and primarily for a purpose other than to bring an offender to justice; and that the prosecution terminated in his or her favor."  La Frankie v. Miklich, 618 A.2d 1145, 1147-48 (Pa. Commw. Ct. 1992) (emphasis added).

criminal proceedings against Nicholson.  Accordingly, all of
Nicholson's state tort claims fail.

                                IV.

        We now determine the amount of damages to which
Nicholson is entitled for his successful § 1983 claim.  He
requests both compensatory and punitive damages.

        Compensatory damages for § 1983 claims are "determined
according to principles derived from the common law of torts."
Memphis Cmty. School Dist. v. Stachura, 477 U.S. 299, 306 (1986).
The underlying purpose of such damages is "to compensate persons
for injuries caused by the deprivation of constitutional rights."
Carey v. Piphus, 435 U.S. 247, 254 (1978).  We consider not only
the plaintiff's monetary loss due to injury, but also
"'impairment of reputation ..., personal humiliation, and mental
anguish and suffering.'"  Memphis Cmty. School Dist., 477 U.S. at
307 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350
(1974)).

        For compensatory damages, Nicholson argues that Officer
Esteves is liable for the physical injury that Nicholson suffered
to his right wrist and hand and for the pain and suffering which
he continues to endure.  Because "[t]here is no right to damages
other than nominal ones for violation of a constitutional right
unless actual injury is proven,"  we must determine whether
Nicholson has proven that each of the three conditions from which
he suffered, (1) right carpel tunnel syndrome, (2) thumb CMC
arthrosis, and (3) right trigger thumb, were proximately caused

                                -13-

by Officer Esteves.  <u>Bolden v. Se. Pa. Transp. Auth.</u>, 21 F.3d 29, 34 (3d Cir. 1994); <u>see</u> <u>also</u>, <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 193 (3d Cir. 2004).

There is no evidence that Nicholson suffered any pain, numbness, or swelling in his right hand or wrist prior to August 17, 2006.  The handcuffs applied to his wrists on that date caused immediate pain and eventual numbness and swelling during the 2.5 to 3-hour period during which he was shackled.  Approximately one week later, Nicholson saw his primary care physician, Dr. Barsh, at which time Nicholson was complaining of lingering pain and numbness in his right hand and wrist.  Dr. Barsh later referred him to Dr. Lee and then to Dr. Steinberg, thereby setting in motion a series of consultations and treatments which culminated in his decompression surgery on October 22, 2008.

On the question of whether Nicholson's carpal tunnel syndrome was caused by the handcuffs applied by Officer Esteves, Dr. Steinberg, who treated Nicholson, stated that "it would appear chronologically that the handcuffs did contribute to the development of [Nicholson's] carpal tunnel syndrome."  Pl.'s Ex. 4 at 50.  Dr. Lee, however, was less certain.  In her report, she states that although "it is possible that [Nicholson's] incident with the [Officer Esteves] may have caused or aggravated his condition ... it is difficult to ascertain the exact causality."  <u>Id.</u> at 90.  Based on the evidence presented, we find that Nicholson has established by a preponderance of the evidence that

-14-

Officer Esteves's application of excessively tight handcuffs
caused him to develop right carpal tunnel syndrome.  Officer
Esteves is therefore liable to Nicholson for damages resulting
from this injury.

We also find, based on Dr. Steinberg's conclusions,
that Nicholson has not proven that his CMC arthrosis and right
trigger thumb or any aggravation were causally related to the
handcuffing episode.  Accordingly, Officer Esteves is not liable
for damages to Nicholson for these injuries.

To quantify the compensatory damages to which Nicholson
is entitled, we begin with the direct cost of his injuries, that
is, his medical bills.  Nicholson introduced into evidence
records of the charges for medical services he received from Dr.
Lee and Dr. Steinberg.  There are no records of the costs
incurred for his treatment by Dr. Barsh.  Dr. Lee charged a total
of $1,460 and Dr. Steinberg charged $4,884 for the consultations
and treatments they provided to Nicholson in relation to his hand
and wrist injuries.  This total of $6,344 includes treatment for
all three of Nicholson's conditions, but only his carpal tunnel
syndrome was caused or aggravated by the handcuffs.  We will
apportion one-third of these costs to his carpal tunnel syndrome,
and the remaining two-thirds to his CMC arthrosis and right
trigger thumb.  Accordingly, Officer Esteves is liable to
Nicholson for $2,115 to compensate him for the medical expenses
he incurred as a result of the handcuffing incident.

Next we consider damages for Nicholson's pain and suffering.  The excessive tightness of his handcuffs, while in police custody, caused him pain and suffering, and the resulting carpal tunnel syndrome continues to cause him some pain and numbness to this day.  Treatment for this condition involved a series of painful injections by Dr. Lee as well as invasive surgery by Dr. Steinberg.  After surgery, Nicholson underwent a number of physical therapy sessions and continues to do so up to the present.  In addition, he has some limitation in the use of his right hand.

However, not all of Nicholson's pain and suffering is attributable to his carpal tunnel syndrome, and therefore to Officer Esteves's actions.  Many of Nicholson's symptoms resulted from his CMC arthrosis and trigger thumb.  According to Dr. Steinberg's expert report, the pain which Nicholson experiences now, and will likely continue to experience, is "predominantly ... at the base of the right thumb," which is the area afflicted by his CMC arthrosis, not carpal tunnel.  Pl.'s Ex. 4 at 50.  Furthermore, the "thumb spica splint" which inhibits normal functioning of Nicholson's right hand was recommended by Dr. Steinberg as a remedy for his CMC arthrosis, not carpal tunnel. Id.  We find Dr. Steinberg to be credible.

Furthermore, the severity of Nicholson's carpal tunnel symptoms would likely have been reduced had he heeded the recommendations of his treating physicians and undergone decompression surgery in early 2007 rather than in the fall of

-16-

2008.  Plaintiffs seeking compensation have a duty to mitigate their damages.  See Yosuf v. United States, 642 F. Supp. 432, 441 (M.D. Pa. 1986); see also McClure v. Indep. School Dist. No. 16, 228 F.3d 1205, 1214 (10th Cir. 2000); Meyers v. City of Cincinnati, 14 F.3d 1115, 1119 (6th Cir. 1994).  By putting off decompression surgery for nearly two years, Nicholson acted unreasonably in failing to mitigate his damages.  Accordingly, we will reduce his overall pain and suffering award to reflect the fact that his suffering would have been less severe had he obtained timely treatment.

We find that Nicholson has experienced and will continue to endure some physical pain because of his medical conditions.  Although we find that the totality of his suffering is significant, especially in light of the fact that he has some limitation in the function of his right hand, his condition can only be partially attributed to Officer Esteves's actions. Nicholson's CMC arthrosis and right trigger thumb, which underlie a significant portion of his prior and current symptoms, were not caused by the handcuffing incident.  In addition, by neglecting to obtain timely surgical treatment as recommended by both Dr. Lee and Dr. Steinberg, Nicholson failed properly to mitigate his injury.  Taking all of these factors into consideration, we find that Nicholson is entitled to pain and suffering damages of $75,000.

The award of compensatory damages to which Nicholson is entitled is $2,115 for medical expenses plus $75,000 for pain and suffering for a total of $77,115.

In addition to compensatory damages, Nicholson requests punitive damages to be awarded against Officer Esteves. "[P]unitive damages in general represent a limited remedy, to be reserved for special circumstances." Savarese v. Agriss, 883 F.2d 1194, 1205 (3d Cir. 1989). The Supreme Court has held that, in § 1983 cases, consideration of punitive damages is proper if the defendant's conduct exhibits "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law." Smith v. Wade, 461 U.S. 30, 51 (1983). The primary purpose of punitive damages is the "deterrence of future egregious conduct." Wade, 461 U.S. at 49; Seales v. City of Lancaster, 553 F. Supp. 2d 427, 433 (E.D. Pa. 2008). One of the factors to be considered by the fact finder in determining whether to exercise its discretion to award punitive damages is the extent to which compensatory damages alone are sufficient to have the desired deterrent effect. See Third Circuit Model Civil Jury Instructions § 4.8.3 (2008).

Here, Nicholson informed Officer Esteves on several occasions that the excessively tight handcuffs were causing pain and numbness and Officer Esteves did not attempt to alleviate Nicholson's discomfort during several hours he was in the custody of Officer Esteves. While we do not condone the behavior of Officer Esteves, we exercise our discretion not to award punitive

-18-

damages.   Nicholson has not established that special circumstances exist for the award of such damages.   Moreover, the compensatory damages awarded are sufficient to have the desired deterrent effect.